901 Bklyn Realty LLC v Perrineau (2024 NY Slip Op 50509(U))

[*1]

901 Bklyn Realty LLC v Perrineau

2024 NY Slip Op 50509(U)

Decided on May 1, 2024

Civil Court Of The City Of New York, Kings County

Jimenez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 1, 2024
Civil Court of the City of New York, Kings County

901 Bklyn Realty LLC, 901 BKLYN 12 REALTY LLC, OCEANWALK BEACH BKLYN REALTY LLC, OCEANWALK CONDO BKLYN REALTY LLC, 780 BKLYN REALTY LLC, MINNETONKA III BKLYN REALTY LLC and MINNETONKA V BKLYN REALTY LLC, Petitioners,

against
Tarsha Perrineau aka TRINA PERRINEAU, VICTOR U. STEPHENS, JOHN DOE and JANE DOE, Respondents.

Index No. 93063-17

Kaufman Friedman Plotnicki & Grun LLP
Attn: Ari Reuben Grun, Esq.
300 East 42 Street
New York, New York 10017
agrun&commat;kfpgllp.com
Attorneys for Petitioner — 901 Bklyn Realty LLC / Oceanwalk Beach Bklyn Realty LLC / 901 Bklyn 12 Realty LLC, Oceanwalk Condo Bklyn Realty LLC/780 Bklyn Realty LLC/Minnetonka III Bklyn Realty LLC/Minnetonka V Bklyn Realty LLC
Stern & Stern Esqs. 
Attn: David Lyle Stern, Esq.
50 Court Street
Suite 1100
Brooklyn, New York 11201
sternandsternesq&commat;aol.com
Attorney for Respondent — Victor U. Stephens

Sergio Jimenez, J.

This nonprimary residence holdover proceeding seeks recovery of the property at 901 Washington Avenue, Apartment 3E, in Brooklyn, New York 11225. The petition alleges that the Respondent-Perrineau is not using the subject rent-stabilized apartment as her primary residence. Respondent Victor U. Stephens (hereinafter "respondent" or "Mr. Stephens") alleged a defense of succession rights stemming from his non-traditional family relationship with the tenant of [*2]record Tarsha Perrineau aka Trina Perrineau. Ms. Perrineau did not appear during the trial. This proceeding was transferred from the resolution part to the trial part in October of 2023. The court commenced and completed the trial on March 20, 2024. The court then reserved decision.
Hearing
Prior to trial, the parties stipulated to enter into evidence a variety of documents, including P1 (certified deed), P2 (certified MDR), P3 (DHCR rent registration summary), P16 (Victor Stephens photo ID) generally. The parties also agreed to admit into evidence P5 (Golub notice), P6 (the petition and notice of petition), P7 (notice of appearance and verified answer), and P8 (Victor Stephens verified Bill of Particulars). For the purposes provided under CPLR § 3117, the parties agreed that the deposition transcripts of Victor Stephens and Tarsha Perrineau both came in as (P9/10/11 and P12/13/14, respectively with their Errata Sheets and exhibits).
Through credible testimony of Kevin Padgett, a managing agent for the property, petitioner authenticated P4 (2015-2017 lease). This witness testified that Ms. Perrineau was no longer living in the premises and that he was familiar with the occupancy since March of 2015 when the company took over management. Petitioner then rested.
At that point, respondent moved for CPLR § 4401 relief. The court, citing the high standard required for this finding, denied the motion. It bears noting here that throughout not just the petitioner's testimony, but also the respondent's, that the tenant of record, Ms. Perrineau, vacated the premises in 2016. The respondent then moved onto their succession defense.
In addition to testifying on his own behalf, the respondent called two witnesses: Christopher Martin and Albert "Teddy" Berthaud III.
Mr. Martin [FN1]
testified that he had known Mr. Stephens since around 1987 and had developed a close relationship with Mr. Stephens. He highlighted the progression, from his point of view, of the respondent's relationship with Ms. Perrineau from its inception to when it ended, allegedly, 11 or 12 years later. He testified that he believed Mr. Stephens and Ms. Perrineau to be headed towards marriage based on his observations of their relationship and their behaviors.
Notably, Mr. Martin also testified as to Mr. Stephen's extreme sadness as a reaction to the dissolution of Mr. Stephens and Ms. Perrineau's relationship. On cross-examination, Mr. Martin admitted he had never spent the night at the apartment while Ms. Perrineau still lived there. Mr. Martin also knew nothing as to their finances.
Respondent next called Mr. Albert "Teddy" Berthaud III, a neighbor living in the building, who stated that he had been living in the building all of his life. He noted that he was familiar with both the respondent and the former tenant of record. Mr. Berthaud stated he believed Mr. Stephens and Ms. Perrineau to be a married couple throughout the time that they all lived in the building. He discussed the various activities that he saw them engaging in, including the holidays they celebrated. He remembered Ms. Perrineau's dog, Chicote, who he believed Mr. Stephens [FN2]
had bought as a gift for Ms. Perrineau. Mr. Berthuad remembered these details [*3]because his young son liked to play with the dog. Mr. Berthaud admitted that he did not know when Ms. Perrineau moved out and that he did not spend too much time in/around the building during 2013-2014 due to his commitments as a father. He also admitted that he had not stayed overnight with the respondents or that he had any familiarity with their financial arrangements.
The bulk of the testimony was presented when Mr. Stephens, himself, testified. Mr. Stephens testified that he lived in the premises form 2006 through the present. He described his relationship with Ms. Perrineau from the commencement of the relationship in 2006 through its end in the spring of 2016. Mr. Stephens described how he, rather than Ms. Perrineau, did the majority of the cooking. He stated that they had worked out a 60%-40% rent arrangement and that he would pay whatever part of the bill she asked him to pay. He spoke of his relationship with Ms. Perrineau's family in the south (Virginia) and how they considered themselves "Road Dog[s]" in that they liked to drive to go on trips.
Through this testimony, Mr. Stephens entered into evidence Ra, Rb, Rd, Re, Ri (variety of pictures). The court declines to accept Rc into evidence as it was not tendered during discovery. On cross-examination, Mr. Stephens admitted to confusion between dates, and he admitted to some minor inconsistencies with answers given at his deposition. Mr. Stephens also admitted to the lack of formal documents that would show financial interdependence (such as life insurance made out from Ms. Perrineau naming Mr. Stephen's as beneficiary, a lack of joint cell phone plans, etc.) and that there was only one joint bank account which existed only briefly between the two. Notably, petitioner's counsel elicited on cross-examination admissions that the relationship between the two underwent a variety of changes at different stages during a seemingly prolonged process of breaking up.[FN3]

The court, in making a credibility determination, takes into account not only the body language and demeanor of the various witnesses, prior statements made in depositions but also of the feelings shown exhibited by a witness particularly when the emotionality is remembered all too well.
While the court has highlighted parts of the relevant testimonies, it acknowledges that it need not do so,[FN4]
but chooses to do so here to note to both parties some of the facts that were essential for the disposition of this petition.
Petitioner did not present any evidence in rebuttal.
Discussion
As it has been noted by the appellate courts, the purpose of the succession rule is to prevent displacement of family members who have been residing with tenants at housing accommodations for an extended period of time (Jourdain v New York State Division of Housing and Community Renewal, 159 AD3d 41 [2d Dept 2018]). The watershed decision of Braschi v Stahl Assocs. Co., 74 NY2d 201 (1989) established criteria for finding a non-traditional familial relationship. Various factors were identified such as longevity of the relationship; mutual reliance for payment of expenses and necessities; intermingling of finances, shown as a matter of example by joint bank accounts; engaging in family-type activities like attending family [*4]functions together; formalizing of legal obligations by means such as naming one another as beneficiaries in wills and/or executions of powers of attorney; holding themselves out as family members to other family members, friends, community members, and religious institutions; reliance on each other for daily family services or functions; and other manifestations of a long-term emotionally-committed relationship. The Braschi rule was later codified by 9 NYCRR § 2520.6(o)(2)(i)-(viii), and Braschi was also made part of statutory law by the Rent Reform Act of 1997.
This analysis, though, is not just a matter of checking off which factors a respondent has successfully proven (Lamarche v. Miles, NYLJ, Nov. 4, 2005, at 19, col 1 [Civ Ct, Kings County] ["The evaluation of the testimony is not merely a ministerial act of going down a check list of factors. A family is a family, whether the members are legally married husband and wife, or 'nontraditional' gay life partners."]). Rather, what is required is a more involved analysis as to the relationship itself. As 9 NYCRR § 2520.6 (o)(2) specifically states that no single factor shall be solely determinative, "[t]he factors listed in the statute to consider in making the determination, such as sharing expenses and intermingling finances, are merely suggestions and not requirements" (Wiener Mgmt. Co. v Trockel, 192 Misc 2d 696, 703 [Civ Ct, Queens County 2002]). Even entirely missing a factor does not preclude a determination that the respondent seeking to assert succession and the tenant of record had a "family-like relationship" (Cozzolino v New York State Division of Housing and Community Renewal, 204 AD3d 494 [1st Dept 2022] [holding that the "totality of the relationship as evidenced by the dedication, caring and self-sacrifice of the parties ... should, in the final analysis, control"]; Braschi, supra, 74 NY2d at 213; Matter of 530 Second Ave. Co., LLC v Zenker, 160 AD3d 160, 163 [1st Dept 2018]).
Of particular importance is a line of cases in both the First and Second Departments that states that a lack of "legal and financial obligations is not dispositive" (Jeremy Properties, LLC v Franklin, 81 Misc 3d 135[A], 2023 NY Slip Op 51395[U][App Term 2d Dept, 2nd, 11th and 13th Jud Dists, 2023]; 1035 Washington Realty, LLC v Weston, 67 Misc 3d 138[A], 2020 NY Slip Op 50629(U) [App Term 2d Dept, 2020]; 178 East 70th Street LLC v. Woodward, 66 Misc 3d 151[A], 2020 NY Slip Op 50299[U] [App Term 1st Dept 2020]; Boston Tremont Housing Development Fund Corporation v. Dunbar, 62 Misc 3d 844 [Civ Ct, Bronx County 2018]). Here it is without dispute that the respondent, while having informal financial intermingling such as the splitting of the Verizon bills, did not have estate planning formalities with the former tenant of record.
Out of the eight (8) factors to be evaluated according to RSC § 2520.6(o), respondent has demonstrated five (5) of them. Namely they have shown through the testimony and evidences a relationship spanning the better part of a decade. Respondent's proof demonstrates that he and Ms. Perrinaeu shared and relied upon each other for payment of household or family expenses, that they engaged in family-type activities by celebrating holidays together, by holding themselves out as family members, by relying upon each other for daily family services and by evincing behavior that showed the intention of creating a long-term emotionally committed relationship. Further, the court understands that interpersonal relationships are complicated and not necessarily clearcut on legal standing, hence the original need for the Braschi court's [*5]decision.[FN5]
Especially in situations where parties are of limited financial means, the lack of formal financial documents will not necessarily undermine a succession claim (Roberts Ave Assocs. v Sullivan, 2003 NY Slip Op 51091[U][App Term 1st Dept 2003). The court may accept that there are not formal financial entanglements and still find that the respondent has made out a succession rights defense. The court does so in this situation.
When evaluating a relationship, the court notes the law's increasing reluctance to inquire into subjective factors. Rather, as can been seen in the prohibition against even considering evidence of an intimate, sexual relationship, the trend in the law is to look only to outward, objective manifestations of the relationship. Given this trend, this court is of the opinion that it is more proper to take a nuanced view when evaluating relationships for the purposes of determining succession rights.
The legislature sought to protect family homes from disruption when the leasehold died or moved out and, in the late 1990s, the Legislature began to adopt the approaches that were first announced by the courts. Since that time however, the cultural, and to some extent legal, definition of family has expanded to include categories that the original drafters might have been unwilling to embrace to the extent that they would have considered these categories at all (see West 49th Street, LLC, v O'Neill, 77 Misc 3d 385 [Civ Ct, New York County 2022] [observing the challenges of evaluating a relationship that is not "dyadic," i.e., one that has more than two members]). Here, the court must answer the question whether only "successful" relationships have merit or if a long-term relationship which while aspiring for permanency falls short, for a myriad of possible reasons, also deserves protection. In an extreme example, should we, as a society, discount the work of Sonny & Cher solely due to the relationship ending, even if publicly and badly? The court agrees that an entirely ephemeral Airbnb weekend romance, even a passionate one, should not result in statutory protections and colorable claims succession rights. However, the relationship before the court was not a throwaway relationship. Rather, after evaluating all the testimony and evidences provided, this was a genuine family relationship that, lasted, through ups and downs, for a decade.
Further the court has concerns that an analysis that rewards only "successful" relationships could chill organic progressions within relationships and may encourage the maintenance of romantic or other family-like entanglements solely for the purpose of obtaining housing protections. Setting aside, however, those extreme, and likely rare examples, the court also questions how much it can, itself, determine the success of any relationship. Despite recent curtailments on the right to privacy by federal courts, individuals and families have the right to make and implement important personal decisions without governmental interference, especially when those decisions do not impact the interests of others (Eisenstadt v Baird, 405 US 438 [1972] [establishing the right of unmarried couples to contraception]; but see Dobbs v Jackson [*6]Women's Health Organization, 597 US 215 [2022]).[FN6]

This should not be taken to mean that the petitioner's right to the premises are not opposed in the case at bar and have not been considered. Petitioner's interests were considered in the issuance of this order and petitioner's counsel's litigation strategy and ability are a credit those interests. Rather, the court opines that the subjective nature of a relationship between people (whether two or more) has its own unique cadence, which, while it must be analyzed by the court in the context of this defense is a difficult exercise for a logical machine like the court. In fact, to conduct a more invasive inquiry, could violate the spirit of the New York State Constitution Article I §12, which protects against such an unreasonable search. Here, the respondent has shown enough, even lacking the formal documents underlying a legal relationship, through unrebutted testimony among other evidences that he cohabited, for two years prior to Ms. Perrineau vacating the apartment in a non-traditional family type relationship. Of note, the petitioner did not present evidence of how the relationship had changed to such a degree that it no longer constituted a family type of relationship, outside of vague testimony about there being "some changes." The court finds this testimony, under these particular set of facts, does not negate respondent's affirmative defense. The court questions whether this proceeding would have gone to trial had Ms. Perrineau had become deceased rather than just the relationship. As it stands, Mr. Stephens did reside with the tenant of record at the housing accommodation for an extended period of time as a family member as was required by the Jourdain Court (though in this case, the family relationship was non-traditional).
Conclusion
For the above reasons, the petition is dismissed and respondent is entitled to a judgment of dismissal. The parties may pick up any exhibits submitted in Part O, but if it has not been done so within thirty (30) days from the date of this order, they will be discarded according to court directives. This constitutes the decision and order of the court.
Dated: May 1, 2024
Brooklyn, New York
Sergio Jimenez, JHC

Footnotes

Footnote 1:Mr. Martin testified to a variety of his professional accolades and industry recognitions which this court finds to be irrelevant to the matter at hand.

Footnote 2:Mr. Berthaud had testified that those who were friendly in the building had nicknames for one another, and Mr. Stephen's nickname was "Black." Thus at trial Mr. Berthaud referred to respondent-Stephens by use of this nickname.

Footnote 3:Two of respondent's witnesses stated that there were periods of breaking up and reunifying.

Footnote 4:Only the facts deemed essential are required in either written or oral decision pursuant CPLR § 4213.

Footnote 5:At the time that Braschi was decided, New York State, along with most of the United States, was actively discriminating against the LGBTQ community by withholding the myriad of legal, financial and cultural protections embodied by marriage. While this proceeding does not deal with an LGBTQ relationship, the spirit of the court's decision embraces non-traditional relationships.

Footnote 6:Notwithstanding the holding by the Dobbs Court, the fundamental right to private decision-making by adults outside of the specific context of abortion is still fundamentally sound as a matter of constitutional law (Lawrence v. Texas, 539 US 558 [2003]; Obergefell v. Hodges, 576 US 644 [2015]).